MELINDA LOUISE CHEE, Plaintiff-Appellant,
v.
KEVIN SUN WAI CHEE, Defendant-Appellee.
No. 28843
Intermediate Court of Appeals of Hawaii.
June 19, 2009.
On the briefs:
Melinda Louise Chee Plaintiff-Appellant Pro Se.
Kevin S.W. Chee Defendant-Appellee Pro Se.

MEMORANDUM OPINION
(By: Watanabe, Acting Chief Judge, Nakamura, and Fujise, JJ.)
Plaintiff-Appellant Melinda Louise Chee (Mother) appeals pro se from the "Order re: Trial Issues" (Custody Order) entered on October 12, 2007, by the Family Court of the First Circuit (family court)[1] The Custody Order was the last in a series of orders issued in response to Mother's January 16, 2007, Motion and Affidavit for Post-Decree Relief (January 2007 Post-Decree Motion), in which she sought, among other things, to change the legal and physical custody of H.C., the youngest child of Mother and Defendant-Appellee Kevin Sun Wai Chee (Father), from Father to Mother. The Custody Order denied Mother's request and ordered that Father shall have legal and physical custody of H.C.
For the reasons set forth below, we vacate: 1) the Custody Order to the extent that it grants sole custody of H.C. to Father; 2) the ex parte orders issued by the family court on November 1, 2000, and November 6, 2000, which materially affected the decision of the family court to grant sole custody to Father in the Custody Order; and 3) the order regarding the January 2007 Post-Decree Motion issued by the family court on March 30, 2007, to the extent that it denied Mother's request that Father pay her attorney's fees and costs for prior hearings and actions. We remand the case for further proceedings consistent with this Memorandum Opinion.

I. BACKGROUND

A.
Mother and Father were divorced in March 1996. The divorce decree granted Mother and Father joint custody of their four minor children, including H.C, and the children moved to the mainland to live with Mother while Father remained in Hawai'i. The divorce decree provided that Father would have liberal time-sharing of the children with Mother.
In September 1999, the parties stipulated to modify the divorce decree. The stipulated order maintained the joint custody arrangement but provided that the children would reside in Hawai'i with Father, with Mother enjoying liberal time-sharing of the children if she continued to reside on the mainland. If Mother returned to live in Hawai'i, the parties' goal was equal time-sharing. The stipulated order further provided that Kimberly S. Towler (Towler), the appointed Custody Guardian Ad Litem (CGAL), would "assume a `gatekeeper' CGAL role to monitor the parents' ability to meet the children's needs, their ability to contain their conflicts, and their ability to stop aligning or alienating the children and assigning blame."

B.
In October 2000, Father experienced difficulties in securing H.C.'s return from the mainland after a visit with Mother. H.C. cried uncontrollably and threatened to kill herself when placed on a flight to Hawai'i, and the airline refused to transport her. Father filed a motion for an order requiring Mother to turn H.C. over to Father, which the family court granted after a hearing in which both parties participated. Father then traveled to the mainland to obtain H.C. with his adult daughter and the CGAL. H.C. resisted leaving with Father and the police were called. Mother and H.C. alleged that H.C. may have been sexually abused by Father and H.C.'s paternal grandfather, allegations that were subsequently determined to be unfounded. Father left the mainland and returned to Hawai'i without H.C.
On November 1, 2000, Father filed an ex parte motion for an order granting him temporary sole legal and physical custody of H.C., requiring that H.C. be turned over to Father, and restraining Mother from transporting H.C. or contacting H.C. until further order of the court. In support of this ex parte motion. Father submitted an affidavit which stated that: 1) Father was told by one of his sons that Mother had told the son and H.C. to tell mainland therapists that the son and H.C. would commit suicide if forced to return to Hawai'i and that Mother said she would commit suicide if the children returned to Hawai'i; 2) Mother failed to disclose that she had enrolled H.C. in school on the mainland, which indicated that she had never intended to comply with the family court's October 2000 order to return H.C. to Father; and 3) Father was concerned about Mother's mental and emotional health and feared that Mother would flee with H.C. or do something damaging to herself or H.C. if Mother received prior notice of the requested ex parte order.
Father also submitted a letter from the children's psychotherapist. Sue Lehrke, Ph.D., which stated that Mother has been lobbying the children heavily to report to professionals involved in the case that the children want to change custody. Dr. Lehrke reported that one of the sons had related the same suicide statements by Mother that Father had set forth in his affidavit. Dr. Lehrke stated she believes that Mother's actions constitute serious parental alienation; that H.C. now suffers from Parental Alienation Syndrome; and that there is risk that Mother may attempt to flee with H.C. if Mother realizes H.C. will be returned to Hawai'i.
The family court issued its order granting Fathers's ex parte motion on November 1, 2000, (November 1, 2000, Ex Parte Order) and further directed that this order not be served on Mother until H.C. was in Father's custody. The November 1, 2000, Ex Parte Order contained the family court's finding that " [H.C.] has been severely alienated by [Mother] and it is in the minor child's best interest to be put in the temporary legal and physical custody of [Father] and returned to Hawai'i immediately."
Father traveled to the mainland and again experienced difficulty in regaining custody of H.C, but eventually he was able to secure her return to Hawai'i. The family court held a review hearing on November 3, 2000, at which Mother's counsel, Thomas Farrell, appeared on her behalf. The transcript of that hearing was not included in the record. Father represents that at the hearing, the family court noted that H.C. had been returned to Honolulu. There is no indication that the family court considered evidence or made findings regarding the validity of the November 1, 2000, Ex Parte Order at the review hearing. A further review hearing was set for November 17, 2000.[2]
On November 6, 2000, Father filed an ex parte motion for an order awarding him temporary sole legal and physical custody of all four minor children and restraining Mother or any agents operating on her behalf from
personally contacting [Father], [Father's] family members and the minor children, their school, child care providers, any medical facility or medical personnel, and [Father's] office which includes telephoning, e-mailing, faxing, visiting or coming within three (3) blocks of [Father's] residence, caretakers residences, medical facilities, schools, [Father's] office and passing any messages to the minor children through third parties until further order of the court.
In support of this ex parte motion. Father submitted an affidavit, which provided his account of the difficulties he experienced regaining custody of H.C. on the mainland. According to Father, the CGAL, Father, and Father's office manager went to H.C.' s school. Mother was notified and she and her attorney arrived at the school. Mother told H.C. that H.C. was going to be taken by force and H.C. became hysterical. H.C. had to be physically grabbed and pushed into Father's car. H.C. sat between the CGAL and Father's office manager in the backseat. While Father was driving on the freeway, H.C. opened the rear door and Father had to pull over and have H.C. restrained. While in the car, H.C kept repeating things such as: 1) they were "'evil, heartless creatures for taking her from her mother'"; 2) "if she couldn't be with her mother on earth, she would be with her mother in Heaven"; 3) "she prayed to God to kill her if she couldn't be with her mother"; 4) "[s]he prayed to God that her mother not give up in trying to get [her]"; 5) she would grab a gun and shoot herself, open the car door, or open the plane's door; 6) "the world was a dark, cruel place"; and 7) H.C and her mother "had a suicide pact and that her mother felt that she would be going to hell." Father related that they were detained by police based on an order apparently obtained by Mother directing that H.C. remain in Mother's home state, but were eventually released. Father stated that H.C.'s mood brightened as time went on and that she was taken to Kahi Mohala upon arrival in Honolulu. Father stated that he was concerned that Mother
may show up in Hawaii and try to contact [H.C] and the other children. It is very clear that she is desperate based on what [H.C] has been saying, and with her actions, I believe that [Mother], herself, appears to be mentally disturbed.
The family court signed the order granting Father's ex parte motion on November 6, 2000 (November 6, 2000, Ex Parte Order)the same day the motion was filed. (We will collectively refer to the November 1, 2000, Ex Parte Order and the November 6, 2000, Ex Parte Order as the "November 2000, Ex Parte Orders). In support of the November 6, 2000, Ex Parte Order, the family court found in relevant part:
1. The minor child, [H.C], born ... [in] 1991, has been severely alienated by [Mother] and it is in the minor child's best interest to remain in the temporary legal and physical custody of [Father] in Hawai'i.
2. It is in the best interest of all the minor children to be in the temporary sole legal and physical custody of [Father] until further order of the Court.
3. It is in the best interest of the minor children that [Mother] not be allowed contact of any kind with them until further order of the Court.

C.
The family court held a review hearing on November 17, 2000. Mother's newly retained counsel, Durrell Douthit (Douthit), appeared at the hearing on Mother's behalf. A transcript of the review hearing was not made part of the record. Based on the written order issued after the review hearing and Father's representations, it appears that Douthit requested that he be allowed to conduct discovery, and the family court granted him permission to contact the treatment professionals involved in the case, Drs. Acklin, Merrill, and Lehrke, with conditions attached to the contact with Dr. Lehrke. There is no indication that the family court considered evidence or made findings regarding the validity of the November 6, 2000, Ex Parte Order at the review hearing. The review hearing order stated that "[n]o further hearing is set."
In January 2001, Mother pursued discovery by noticing the depositions of the children's paternal grandfather and the CGAL and by subpoenaing records from the Honolulu Police Department.
On January 26, 2001, Mother purportedly filed a "Motion Relating to Comprehensive Parenting Plan" (Parenting Plan Motion).[3] On March 5, 2001, Mother submitted an ex parte motion to set the Parenting Plan Motion for a hearing. In support of that motion, Mother's counsel submitted an affidavit which stated that the November 6, 2000, Ex Parte Order prevented Mother from having any contact with her children pending further order of the court; Mother's counsel attempted to negotiate a long-range settlement with the CGAL and Father's counsel that would permit the children to get "the best of both of their parents, " but was unsuccessful; Mother therefore filed the Parenting Plan Motion which requested the appointment of a competent mental health professional who could help the parents develop a good, longrange plan for the children and could make recommendation to the court if the parents were unable to reach agreement; the hearing on the Parenting Plan Motion was originally set for February 21, 2001, but was continued indefinitely after a discussion among the parties' counsel, the CGAL, and the family court appeared to result in an agreement on the procedures for developing a longrange plan for the children; and Mother!s counsel subsequently learned that Father would not agree to the procedures.
The affidavit of Mother's counsel further stated:
9. It has now been about five months since the children have had any contact with their mother, in spite of the fact that the record is clear that [Mother] had been their primary parent for most of their lives.
10. It is simply unfair to [Mother] and to the children to continue to [sic] the ex parte restraining order, without a hearing. [Mother] could, on 48-hours notice, set a hearing on the ex parte order which deprived her of contact with her children, but she continues to prefer a long-range plan. The plan must be developed and work started on it immediately.
The affidavit concluded by requesting that a hearing on the Parenting Plan Motion be set for March 14, 2001. The family court denied the ex parte request to set the Parenting Plan Motion for a hearing.
On April 5, 2001, the CGAL filed a report that included a letter from Child Welfare Services (CWS), State of Hawai'i, which conducted an investigation into allegations of harm to the parties' children. The CWS letter stated that its investigation "unconfirmed" the alleged sexual abuse of H.C. by her paternal grandfather and "confirmed the threat of psychological harm to the [parties'] children by their parents, [Father] and [Mother], because of their on-going post-divorce contentious relationship." The CWS letter further stated that "[b]ased on the sequence of events between summer 2000 and November 2000, the [CWS] confirmed the psychological abuse to [H.C.] by her mother... that escalated and impaired [H.C.'s] ability to function."
The CGAL's report stated that in December 2000, the CGAL advised Mother's counsel that the CGAL would agree to monitored telephone contact between Mother and the children through the Parents and Children Together (P.A.C.T.) Visitation Center, and that the CGAL believed Father also would agree to such contact. According to the CGAL, Mother's counsel responded that Mother found such contact "demeaning" and refused to participate in contacts with her children through P.A.C.T. The CGAL report noted that since November 2000, there had been no contact between Mother and her children.
The CGAL had sent a letter to the parties' counsel dated April 4, 2001, regarding the proposed contact between Mother and the children through P.A.C.T. In her letter, the CGAL stated, in relevant part:
1. Supervised long distance telephone contact has been offered since December 22, 2000, and will need an Agreement or Court Order to be effectuated.... I believe it may be possible for the children to talk from a phone at their home or at the home of family friends, after the initial P.A.C.T. interviews and contact. Each parent will need to sign and maintain a Release of Information so the P.A.C.T. Center can give information to me, and follow all P.A.C.T. Center requirements, as directed by the P.A.C.T. Center. Contact can begin under the guidelines... [in] the P.A.C.T. Visitation Center Guidelines.... In addition, [Mother] must avoid any mention of suicide; any reference to prior conversations about suicide; she is not to pray with [H.C]; she is not to talk about selling the dog, Cody [, ] or the horse she bought [H.C]; she is not to discuss her romantic interests; and she must avoid any mention of the children moving to where she lives or visiting with her.
2. Any in-person contact by [Mother] with any of the children will be fully supervised at the P.A.C.T. Visitation Center, or by a visit supervisor approved by the CGAL;
3. Should [Mother] demonstrate her ability to avoid further psychological abuse in the contacts outlined above. restrictions may be reduced. Reductions of restrictions may include longer and more frequent contact, or tape-recorder "supervision", with review by the CGAL or other person approved by the CGAL, or other accommodations;
4. Should [Mother] maintain a consistent ability to avoid further psychological abuse, and demonstrate to the CGAL an understanding of the harm she caused to the children, particularly [H.C], supervision may be withdrawn.
On November 28, 2001, the family court entered an order regarding the Parenting Plan Motion. The order noted that hearings on the Parenting Plan Motion were held on February 21, March 28, April 11, April 26, and August 16, 2001, during which Mother was represented by Douthit. The order established a "team" of therapists comprised of the parties' therapists, the children's therapists, and psychologist Richard Kappenberg, Ph.D., who was to serve as facilitator of the team. The order directed the team to share information and devise a team plan, with the facilitator assisting in resolving any "log j am." The order precluded Dr. Kappenberg and the parties' and children's therapists from testifying in any family court hearing and prohibited the parties from seeking discovery of records of the team members. The order further provided that the team members were acting as appointed court officers and therefore had quasi-judicial immunity.
In the meantime. Mother filed a complaint against the CGAL with the Senior Judge of the family court. Mother's counsel, Douthit, also filed a motion to withdraw based on Mother's inability to pay his fee, which the family court granted effective on the signing of the order regarding the Parenting Plan Motion.
On August 10, and December 26, 2001, the parties entered into stipulations amending the November 6, 2001, Ex Parte Order to permit the parties' eldest child to visit with Mother on the mainland. According to Father, Mother failed to pay Dr. Kappenberg, the facilitator appointed in the order regarding Parenting Plan Motion, for her portion of Dr. Kappenberg's fees.

D.
On May 15, 2003, Mother, through new counsel Steven Kim (Kim), filed a motion for post-decree relief (May 2003 Post-Decree Motion), seeking the following relief:
1. "[A]n order dissolving and/or voiding, ab initio, the ex parte temporary restraining orders issued herein on November 1, 2000, and November 6, 2000, which prohibit [Mother]... from having any contact with her children, and her children's school, child care providers, medical facility or medical personnel";
2. An order appointing an independent custody evaluator to make recommendations on custody and visitation issues;
3. An order setting aside the order regarding Parenting Plan Motion since the team appointed by the family court has made no progress whatsoever;
4. A review of the performance of CGAL Towler and an order removing Towler as the GCAL;
5. An order setting forth immediate liberal visitation rights, including personal and telephone contacts and mainland visits, and scheduling a trial on the issues of change of custody and visitation;
6. An order awarding Mother sanctions against Father, Father's counsel, and the CGAL arising out of the improper use of the ex parte procedures by which Father obtained custody for the children and a restraining order prohibiting Mother from contacting the children.
In support of the May 2003 Post-Decree Motion, Mother argued, among other things, that use of ex parte proceedings to grant Father sole custody of the children and to impose a restraining order prohibiting contact by Mother was unconstitutional because Mother was not given an immediate hearing to contest the ex parte orders. Mother noted that despite the November 2000 Ex Parte Orders, Mother has had periodic contact with the children through telephone and e-mail communications, to which Father has apparently acquiesced. Mother asserted that the November 2000, Ex Parte Orders were unconstitutional on their face and therefore sought to void them ab initio:
Although ex parte restraining orders are intended to be temporary emergency proceedings, the orders in this case have turned out to be essentially final, permanent injunctions that are overbroad in scope, void of any continuing necessity (assuming in the first place that any legitimate necessity was shown, which [Mother] disputes), and serve only to criminalize the natural and rightful conduct on the part of [Mother] and her children, one of whom is an adult, in maintaining sporadic but necessary contact with one another over the past 2 1/2 years. Issuance of an order that voids the [November 2000 Ex Parte Orders] ab initio will remove the spectre of any criminal repercussions to [Mother] for having maintained periodic contact with her children since the improper and unconstitutional issuance of the [November 2000 Ex Parte Orders] in November of 2000.
Trial on Mother's May 2003 Post-Decree Motion, as well as Father's post-decree motion seeking child support and payment of the children's educational expenses from Mother, was set for December 15, 2003. On September 26, 2003, the family court issued an order regarding continued settlement conference, which set aside the December 15, 2003, trial date subject to further order of the court. The order states that the parties are to work on amending the current temporary restraining order to enable Mother to communicate with the children and to submit the amendment to the family court. It further states that counsel are to discuss the selection of a third-party custody evaluator.
On November 24, 2003, the family court issued an order granting Mother's motion to allow one of the sons to spend Thanksgiving with Mother. The order also directed the parties to submit an order appointing a custody evaluator. On January 9, 2004, the family court entered an order appointing Malcolm Hong (Hong) as the custody evaluator. The order provided that Hong shall participate in settlement conferences and act as a "go between" in discussions involving the parties' counsel, the children's therapists, and the family court regarding the children's reaction to any future visits with Mother. The order further provided that the custody evaluator shall be paid a flat fee of $1,500 before the initiation of services, with each party to pay 50 percent. By letter dated May 21, 2004, Hong notified the parties that he was discontinuing his involvement in the case due to Mother's failure to pay her share of Hong's fee.
On March 24, 2004, Kim filed a motion to withdraw as Mother's counsel, asserting that he has had difficulty contacting Mother and that Mother had lost her job and has been unable to meet her financial obligations. On June 3, 2004, Kim withdrew his motion without prejudice.
On April 12, 2005, Mother filed a motion for summary judgment with respect to her May 2003 Post-Decree Motion on the issues of 1) dissolving or voiding ab initio the November 2000 Ex Parte Orders and 2) establishing immediate liberal unsupervised visitation rights for Mother. By order filed on June 29, 2005, the family court denied Mother's motion for summary judgment. However, based on the agreement of the parties, the family court's order dissolved the temporary restraining orders in the November 2000 Ex Parte Orders with respect to the parties' three eldest children. The family court also set a further hearing for Mother's May 2003 Post-Decree Motion for August 24, 2005.
The transcripts of hearings held before the family court in August 2005 were not included in the record. Father represents that at a hearing held on August 29, 2005, the family court orally dissolved the remaining portions of the temporary restraining orders in the November 2000 Ex Parte Orders that pertained to H.C, and it directed the parties to attempt to schedule mainland visitation by H.C. with Mother. However, no contemporaneous written order reflecting this dissolution of the restraining orders that prohibited Mother from contacting H.C. was filed by the family court.

E.
On January 16, 2007, Mother, now pro se, filed a Motion and Affidavit for Post-Decree Relief (January 2007 Post-Decree Motion) that is at issue in this appeal. By this time, all the children except H.C. were adults. Mother sought an order granting her temporary sole legal and physical custody of H.C. due to a material change in circumstances, namely, that H.C. had been expelled from the private school she had been attending for using marijuana and had been doing poorly at her new school. Mother also sought: 1) an order dissolving the CGAL's "prohibition of prayer" between Mother and H.C; 2) an order disqualifying child psychologist Dr. Sue Lehrke and her associate, Anita Trubitt, from further involvement in the case; 3) a review of the performance and efficacy of CGAL Towler and an order removing Towler as CGAL; and 4) an order awarding Mother her attorney's fees and costs associated with her efforts to resolve custody issues stemming from the temporary restraining orders contained in the "defective" November 2000 Ex Parte Orders, which Mother claimed "still prohibit [Mother] from having any contact with her daughter, [H.C], and [H.C.'s] school, medical facility or medical personnel[.]"
On March 30, 2007, the family court issued an order regarding the January 2007 Post-Decree Motion. The family court: 1) rescinded the restraining orders in the November 2000 Ex Parte Orders that prohibited Mother's contact with H.C. "based upon the parties' agreement made in 2005 (which agreement had not been entered as a written order to date);" 2) discharged Towler as CGAL, not based on any finding of deficiency in her performance, but because a CGAL was no longer necessary; 3) denied Mother's request that Father pay her attorney's fees and costs for prior hearings and actions; 4) denied without prejudice Mother's request to disqualify Dr. Lehrke and Anita Trubitt; 5) reserved Mother's request for an order changing custody of H.C. for further action; and 6) ordered that H.C be interviewed by court officer Barbara Shintani.
On May 12, 2007, the family court filed a second order regarding the January 2007 Post-Decree Motion. The family court: 1) ordered that H.C. will have visitation with Mother from July 1 to 9, 2007, in Hawai'i; 2) set the case for trial on July 10, 2007; 3) reconsidered its order discharging Towler as CGAL and ordered that Towler continue as CGAL, but further ordered that Towler will do no work or contact any of the parties unless the court determines that additional services by Towler as CGAL are necessary.
By letter dated May 23, 2007, Mother complained to the Senior Judge of the family court about the use of Barbara Shintani to advise the family court in this case because Shintani's report and recommendations would not be subject to peer review or other methods to ensure accuracy.
On July 10, 2007, the family court held a trial regarding Mother's January 2007 Post-Decree Motion on the issue of "whether there had been a change in circumstance since the entry of the last [custody] orders and what is in the best interest of the minor child [H.C]" At the time of trial, H.C was sixteen years old. At trial, Mother, Father, two of their adult children, and Mother's friend testified. The parties eldest child testified:
I do believe it would be in the best interests of [H.C] to remain [in Hawai'i] . I believe it is a more stable environment here. She has most of her family here. She has her friends here. She has soccer. She has all these activities, and I don't believe it would be good for her to move.
The eldest child also testified that H.C does not want to move and wants to remain in Father's custody.
After the trial, the family court entered its Custody Order on October 12, 2007, which granted Father legal and physical custody of H.C The Custody Order reiterated that pursuant to the parties' 2005 agreement, Mother may have contact with H.C, and it specified that such contact may be in person or by letter, telephone, email, or other means. The Custody Order further provided that Mother shall have visitation with H.C. and set forth a detailed schedule for visitation. The Custody Order noted that "[H.C] will be eighteen years old [in]... 2009 and no longer a minor. Therefore, any contact between Mother and [H.C] thereafter will be between Mother and daughter and not pursuant to a court order."
On January 11, 2008, the family court filed Findings of Fact and Conclusions of Law regarding its rulings on Mother's January 2007 Post-Decree Motion. The family court made the following pertinent findings of fact and conclusions of law:
II. FINDINGS OF FACT
39. [H.C.] attended [a private school], but was suspended and asked to leave the school in May 2006 for smoking marijuana near campus. She would be permitted to reapply after a year at another school.
.....
45. ... Father enrolled [H.C] in [a public] High School for Fall 2006. Her initial grades at [the public school] were not good. Father has engaged a tutor to assist [H.C] with advanced chemistry, the subject [H.C] had the most difficulty with as a sophomore.
46. [H.C] has become very involved in her school's soccer team and with ... a prestigious soccer club team which involves extensive practice, including soccer camps, travel to neighbor islands and the mainland for competition and parent participation.
4 7. [H.C] has friends and family support here in Hawaii to pursue her soccer and college admission.
47. [sic] There is no evidence that she is cutting school or has been arrested or suspended or is in any further trouble with school authorities.
48. Through circumstance that have happened since 1999, the child has not seen her mother except for a few times over the past years. To fully and abruptly change custody and remove her from Hawaii at this time would not be in her best interest.
III. Conclusions of Law
2. The Court must decide this case based upon the best interests of child standard.
3. Mother has not proven that [H.C.'s] well-being and future welfare will be better served by a full change in physical and legal custody to Mother.
4. In the instant case, it has been shown that it is in the best interest of [H.C] that Father maintain sole legal and physical custody.
5. Further, in the best interest of the minor child, [H.C] shall have contact with Mother without
interference from Father, or any other person acting upon Father's behalf....
.....
9. Father shall sign and forward all necessary consents to release information to Mother, relating to all of [H.C.`s] treating physicians, health care providers, therapists, if any, school and coaches....
.....
11. The parties have stipulated to remove prior restraining orders against Mother's contact with the child(ren).
12. There is no order prohibiting Mother from attending church on [sic] praying with the child.

II. DISCUSSION
Mother's pro se opening brief does not comply with Hawai'i Rules of Appellate Procedure Rule 28. Nevertheless, in light of Mother's pro se status, we will endeavor to address the merits of Mother's contentions regarding the family court's rulings on her January 2007 Post-Decree Motion.[4]

A.
The focus of Mother's appeal appears to be on the family court's denial of Mother's request for temporary sole legal and physical custody of H.C. In particular. Mother asserts that H.C.'s expulsion from her private school for using marijuana constitutes a significant material change of circumstances that justifies granting Mother custody over H.C. Mother also contends that the family court's custody ruling was "defective" because it was premised on the November 2000 Ex Parte Orders. Mother claims that the November 2000 Ex Parte Orders, which transferred sole custody of H.C. to Father and prohibited Mother from contacting H.C, violated her due process rights as the family court never held a hearing to determine whether the change in custody and restrictions imposed by the ex parte orders were warranted.
We agree with Mother that the family court erred in effecting a change in custody and prohibiting Mother from contacting her children through the November 2000 Ex Parte Orders without ruling on the validity of the allegations on which these ex parte orders were based or the continued necessity for the orders. In Doe v. Doe, 120 Hawai'i 149, 202 P. 3d 610 (App. 2009), this court recently addressed the due process requirements for a change in primary physical or legal custody in disputes between parents. This court stated:
We hold that, under the Hawai'i Constitution, absent express findings of exigent or emergency circumstances, due process requires that a parent be given notice and an opportunity to be heard prior to a change in primary physical or legal custody in family court custody matters such as this one. Absent evidence that harm is likely to result from the delay necessary to set a hearing, no parent involved in a custody dispute should have his or her child removed by the police, without notice of the grounds for removal and an opportunity to be heard on the charges. As evidenced by this case, custody disputes are particularly susceptible to dueling allegations of misconduct and abuse. Absent a true emergency, ex parte custody proceedings can provide fertile ground for a misuse of the judicial process.
We further hold that, if a family court determines that an emergency situation requires an immediate change of custody, then the ex parte order changing custody must include notice of: (1) a post-deprivation hearing, promptly set; and (2) the grounds for this extraordinary measure. A parent deprived of custody in this manner must be given a prompt and meaningful opportunity to address the allegations supporting the immediate change of custody.
Id. at 169-70, 202 P.3d at 630-31 (footnote omitted).
Here, with respect to the November 2000 Ex Parte Orders, the family court did not comply with the due process requirements set forth in Doe. The family court did not hold a prompt post-deprivation hearing to address the allegations supporting the change in custody over the children from joint to Father's sole custody or the restraining orders prohibiting Mother from any contact with the children. Indeed, despite Father's only seeking temporary sole custody of the children and (presumably) temporary restraining orders prohibiting contact by Mother, the November 2000 Ex Parte Orders remained in effect for years without any substantive review by the family court. Thus, the November 2000 Ex Parte Orders cannot stand.
Subsequent orders issued by the family court eventually dissolved the essential restrictions imposed on Mother by the November 2000 Ex Parte Orders. On June 29, 2005, the family court dissolved the November 2000 Ex Parte Orders to the extent that they imposed restraints on Mother's contact with the three eldest children. In August 2005, the family court orally rescinded the November 2000 Ex Parte Orders to the extent they imposed restraints on Mother's contact with H.C, and the family court memorialized this ruling in an order filed on March 30, 2007. The Custody Order filed by the family court on October 12, 2007, provided that Mother shall have visitation with H.C, set forth a detailed visitation schedule, and clarified the absence of other restrictions. When the Custody Order was issued, the three eldest children were already adults and thus custody was no longer an issue as to them. After the issuance of the Custody Order, the parties were, as a practical matter, subject to almost the same basic custody arrangements that existed prior to the entry of the November 2000 Ex Parte OrdersH.C. resided with Father in Hawai'i and Mother, residing on the mainland, had the right to visit and contact H.C.[5]
In her January 2007 Post-Decree Motion, Mother sought more than a return to the custody arrangements existing before the November 2000 Ex Parte Orders; she sought temporary sole legal and physical custody of H.C. The family court relied, in part, on the limited contact between Mother and H.C. during the years following the November 2000 Ex Parte Orders in denying Mother's custody request and awarding sole custody of H.C. to Father. We conclude that the November 2000 Ex Parte Orders materially affected the family court's Custody Order to the extent that it granted sole custody of H.C. to Father. See id. at 166-68, 202 P.3d at 627-29. Accordingly, we vacate the November 2000 Ex Parte Orders, and we also vacate the Custody Order to the extent that it grants sole custody of H.C. to Father. See id. at 179-80, 202 P.3d at 640-41.
Before the children's relocation to Hawai'i pursuant to the 1999 stipulated custody order, Mother had been the primary caretaker for the children. Even after the children's relocation, Mother enjoyed liberal time-sharing rights. By prohibiting all contact between Mother and her children, the November 2000 Ex Parte Orders effected a draconian change in the custodial arrangements. Yet, the family court permitted the November 2000 Ex Parte Orders to stand without ruling on the validity of the allegations on which the orders were based or the continued necessity for the orders.
Mother shoulders some of the responsibility for the family court's failure to rule on the substantive merits of the November 2000 Ex Parte Orders. The family court held a review hearing on November 17, 2000, shortly after the November 2000 Ex Parte Orders were issued. Mother's counsel apparently did not challenge or seek a ruling on the merits of the November 2000 Ex Parte Orders, but instead requested that he be allowed to conduct discovery of the children's therapists. Mother subsequently filed a Parenting Plan Motion, seeking the development of a long-range plan regarding custody and visitation. In connection with this motion. Mother's counsel submitted an affidavit dated March 5, 2001, that stated, "It is simply unfair to [Mother] and to the children to continue... the ex parte restraining order, without a hearing. [Mother] could, on 48-hours notice, set a hearing on the ex parte order which deprived her of contact with her children, but she continues to prefer a long-range plan." Thus, it appears that Mother was aware that she could challenge the November 2000 Ex Parte Orders.
Nevertheless, the change in the custody conditions and the prohibition against Mother contacting her children effected by the November 2000 Ex Parte Orders were supposed to be temporary, lasting until the family court had the opportunity to rule on the merits of the underlying allegations and the need for the changed conditions. Here, the family court never ruled on the validity of the allegations on which the November 2000 Ex Parte Orders were based or determined whether the continuation of the November 2000 Ex Parte Orders were necessary. Accordingly, we vacate the November 2000 Ex Parte Orders, vacate the Custody Order to the extent that it grants sole custody of H.C. to Father, and remand the case for any appropriate proceedings consistent with this Memorandum Opinion.[6]

B.
With respect to the other claims raised by Mother regarding the family court's rulings on her January 2007 Post-Decree Motion,[7] we resolve those claims as follows:
1. Mother's request for an order dissolving the CGAL's "prohibition of prayer" between Mother and H.C. is moot.[8] There are no existing prohibitions against Mother praying with H.C. In its Conclusions of Law issued after the Custody Order, the family court stated that "[t]here is no order prohibiting Mother from attending church [or] praying with the child."
2. There is no indication that Dr. Sue Lehrke and her associate, Anita Trubitt, have any ongoing role in this case. Thus, Mother has not demonstrated the need for an order disqualifying Dr. Lehrke or Trubitt from further involvement in the case or that the family court erred in failing to issue such an order.
3. Mother attacks CGAL Towler for providing information in support of the November 2000 Ex Parte Orders. However, we have ruled that these ex parte orders must be vacated. In addition, by order dated May 12, 2007, the family court ordered that Towler will do no work or contact any party as a CGAL until the family court determines that additional services by Towler as CGAL are necessary, and there is no indication that the family court has asked Towler to perform any additional services as CGAL. Given these circumstances, we decline to require the family court to conduct a review of the performance and efficacy of CGAL Towler or to order Towler's removal as CGAL.
4. We vacate the family court's March 30, 2007, order regarding the January 2007 Post-Decree Motion to the extent that the order denied Mother's request that Father pay her attorney's fees and costs for prior hearings and actions. Hawaii Revised Statutes § 580-47(f) (2006) provides, in relevant part:
Attorney's fees and costs. The court hearing any motion for orders either revising an order for the custody ... of the children of the parties,... or a motion for an order to enforce any such order ..., may make such orders requiring either party to pay or contribute to the payment of the attorney's fees, costs, and expenses of the other party relating to such motion and hearing as shall appear just and equitable after consideration of the respective merits of the parties, the relative abilities of the parties, the economic condition of each party at the time of the hearing, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case.
We conclude that in light of our decision in this appeal, the family court should be given the opportunity to reconsider its decision denying Mother's request that Father pay her attorney's fees and costs for prior hearings and actions. We express no opinion on the merits of Mother's request.

III. CONCLUSION
For the foregoing reasons, we vacate: 1) the portion of the Custody Order that grants sole custody of H.C. to Father, 2) the November 2000 Ex Parte Orders, and 3) the portion of the March 30, 2007, order regarding the January 2007 Post-Decree Motion that denied Mother's request that Father pay her attorney's fees and costs for prior hearings and actions, and we remand the case for further proceedings consistent with this Memorandum Opinion.
NOTES
[1] The Honorable Allene R. Suemori presided over proceedings relevant this appeal from 1999 to May 2003, the Honorable R. Mark Browning presided over such proceedings from June 2003 to February 2007, and the Honorable Karen M. Radius presided over such proceedings from and after March 2007.
[2] At the November 3, 2000, review hearing, the family court also granted Mr. Farrellfs oral motion to withdraw as Mother's counsel.
[3] The family court's pleading files provided to this court do not contain Mother's "Motion Relating to Comprehensive Parenting Plan," although a certificate of service for that document and other pleadings referring to that document are included in the files.
[4] In her notice of appeal. Mother appeals from the Custody Order, which was the last in a series of orders issued in response to Mother's January 2007 Post-Decree Motion. The following principle applies to Mother's January 2007 Post-Decree Motion: "[W]here the disposition of a case is embodied in several orders, no one of which embraces the entire controversy but collectively does so,... the orders collectively constitute a final judgment and entry of the last of a series of orders gives finality and appealability to all." S. Utsunomiya Enterprises, Inc. v. Moomuku Country Club, 75 Haw. 480, 494-95, 866 P.2d 951, 960 (1994) (citations, quotation marks, and ellipsis points in original omitted).
[5] The stipulated 1999 custody order that was in effect before the November 2000 Ex Parte Orders provided in relevant part that the children would reside in Hawai'i with Father, with Mother having "joint" custody and enjoying liberal time-sharing while she continued to reside on the mainland.
[6] We note that by the time that briefing in this appeal was completed, H.C. had already turned seventeen, and that H.C. will very shortly turn eighteen. As the family court noted in its Custody Order, once H.C. turns eighteen, it will be up to Mother and H.C, and not the family court, to determine the extent of their contact.
[7] We do not address claims made by Mother on appeal that do not pertain to, or were not made in connection with. Mother's January 2007 Post-Decree Motion.
[8] Mother's prohibition-of-prayer claim was based on the CGAL's April 4, 2001, letter to the parties' counsel.